**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES et al.,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs,* | : | |
| *Ex rel.* | : | |
| | : | |
| | : | |
| **PHILIP HUNTER** | : | |
| *Plaintiff-Relator,* | : | |
| | : | |
| v. | : | **No.     15-2134** |
| | : | |
| **FILLMORE CAPITAL PARTNERS,** | : | |
| **LLC,** *et al.,* | : | |
| | : | |
| *Defendants.* | : | |

## <u>MEMORANDUM</u>

KENNEY, J.                                                                    MARCH 11, 2024

Relator Philip Hunter ("Relator"), along with Plaintiffs the United States, the State of California, the State of Georgia, the State of Indiana, the State of Minnesota, the State of Missouri, the State of New Jersey, the State of North Carolina, the State of Tennessee, the State of Wisconsin, the Commonwealth of Massachusetts, and the Commonwealth of Virginia, brings a False Claims Act ("FCA") action *qui tam* against Defendants Fillmore Capital Partners, LLC; Fillmore Strategic Management, LLC; Fillmore Strategic Investors, LLC; Drumm Investors, LLC; GGNSC Holdings, LLC; Golden Gate National Senior Care, LLC; GGNSC Equity Holdings, LLC; GGNSC Administrative Services, LLC; GGNSC Clinical Services, LLC; Beverly Enterprises, Inc.; and Beverly Health and Rehabilitation Services, Inc. (collectively, "Defendants"). Defendants have moved to dismiss the Complaint.

## I.    FACTUAL BACKGROUND

The following facts are drawn from Relator's Amended Complaint. *See* ECF No. 53. Relator is a Registered Nurse who worked at Golden Living-Riverchase[1] in Birmingham, Alabama, as a weekend supervisor and a weekday treatment nurse from December 4, 2006, until his resignation on February 11, 2007. *Id.* ¶ 31. Relator alleges that the Defendants collectively engaged in a scheme to routinely overbill Medicare and Medicaid over a years-long period at 273 nursing homes. *Id.* ¶¶ 7, 52.

This plan is alleged to have occurred in several phases. First, Defendants made intensive efforts to fill up all the beds in their facilities, especially with high-acuity residents, to increase their reimbursement requests to Medicare and Medicaid. *Id.* ¶¶ 10, 83-91. Defendants were reimbursed by the federal government according to the services that were provided, making high-acuity patients more desirable for the facilities. *Id.* ¶¶ 87, 91. Second, recognizing that labor costs were "the largest expenditure on the P&L," Defendants imposed staffing targets on their facilities that limited the number of medical personnel available based on the number of patients rather than those patients' acuity. *Id.* ¶¶ 170-175. Third, because Defendants had so many high-acuity patients in their facilities combined with a limited number of medical staff, it was physically impossible for Defendants to appropriately treat their patients given the number of employees they had. *Id.* ¶ 98. Nevertheless, Defendants still billed Medicare and Medicaid for performing services that would have been impossible to provide given the staffing levels and the patients' levels of acuity. *Id.* ¶¶ 102-150.

To make claims for payments from Medicare, Defendants submit claims on UB-04 forms that include each resident's RUG level, which is a billing code that documents the amount of care

---

[1] In his Complaint, Relator refers to the Defendants collectively as "GOLDEN LIVING." *See* ECF No. 53 at 1 n.1.

provided (such as the amount of therapy and nursing services provided), and consequently determines the amount of reimbursement that Defendants should receive. *Id.* ¶¶ 110-118. Defendants submitted UB-04 forms that included relevant information such as the resident's RUG level, the total days billed at each RUG level, and the total amount on the claim. *Id.* ¶¶ 104-05. RUG codes are supported by underlying Minimum Data Set ("MDS") assessments, which document in detail "each resident's individualized care needs and functional capacities" and provide justification for the RUG code. *Id.* ¶¶ 121-136. In turn, claims for payment must also be supported by underlying medical records. *Id.* ¶ 137.

Relator alleges that Defendants were not able to treat the large number of high-acuity patients with the limited number of staff available. *Id.* ¶ 176. Therefore, Relator alleges that Defendants submitted falsified claims by filing UB-04 claims with remunerative RUG scores that were backed up by falsified MDS assessments and falsified medical records. *See id.* ¶ 155 n.54 ("CNAs were pressured to falsify medical records to make it appear that they had provided care that they did not provide.").

Relator supports his allegations of this scheme with three pieces of evidence. First, he puts forth his experts' proprietary computer models, which quantified the number of hours of work required by the residents' MDS assessments, the number of hours actually worked, the number of work hours it was possible for the staff to perform, and the amount of care that was possible in each day in each facility.[2] *Id.* ¶¶ 179-184. Relator alleges that the experts' work concluded that "it was mathematically and physically impossible for many of GOLDEN LIVING's facilities to have delivered required ADL care that was reasonable in quantity and duration." *Id.* ¶ 184. Second, Relator cites affidavits from nurses in other lawsuits who described understaffing and overbilling

---

[2] Relator asserts that he hired "nursing home workload experts, database experts, computer simulation experts, and industrial engineers of the subject nursing homes." ECF No. 53 ¶ 179.

in the facilities where they worked. *Id.* ¶¶ 186-187. Third, Relator himself resigned from Golden Living, and stated in his Notice of Resignation that he was unable to properly care for his patients due to the "inadequate number of staff." *Id.* ¶ 37.  Relator also alleges generally that Golden Living received "a continuous stream of complaints and grievances by families of residents and Golden Living's own employees." *Id.* ¶ 194.

As a consequence of the inadequate level of staff, Relator alleges that residents were

> routinely subjected to inhumane, undignified, and repugnant treatment that placed them at unreasonable risk for physical and mental harm, including being (1) forced to use their beds as toilets; (2) left in their own urine and feces for extended periods ("until the urine had dried and formed brown rings on the bed linens" or "until the feces had dried and stuck hard to the resident's body"); (3) not being and bathed for days or weeks despite being incontinent of bowel and/or bladder; (4) not gotten out of bed and left in pajamas/gowns throughout the day; (5) left in bed in the same position for hours on end; (6) left unassisted with feeding when unable to independently eat--with a food tray next to the bed out of reach; (7) left smelling of urine, feces, and body odor, unclean, and unshaven for unacceptably long periods of time; (8) left yelling/crying for help after call lights were pushed but not answered; (9) not provided oral care; and (10) not encouraged or even given liquids to drink.[3]

*Id.* ¶ 177.

Relator alleges that the scheme described herein violates the FCA. Relator makes these allegations against eleven named Defendants which control 273 individual long-term care facilities. *Id.* at 1 n.2. Relator alleges that there was a "drop-down 100% ownership structure existing within this enterprise," such that "all the facilities listed in Exhibit 1 were operated as a single entity." *Id.* ¶¶ 69, 71. Relator claims he "has reason to believe that the level of resident acuity and the care workload was extremely high across all 273 subject facilities that Golden Living operated." *Id.* ¶ 100.

---

[3] It is not clear where Relator obtained this information other than via an unidentified "survey process."  ECF No. 53 ¶ 177 n.61

## II.    PROCEDURAL HISTORY

The Sealed Complaint in this case was initially filed on April 21, 2015, and assigned to Judge Jan DuBois. ECF No. 1. Over the ensuing years, the United States filed over a dozen motions to extend the seal while it continued to investigate. *See generally,* No. 2:15-cv-2134. The case was reassigned to the undersigned on February 23, 2021. ECF No. 26. On July 10, 2023, the United States informed the Court that it and the plaintiff states were declining to intervene at this time. ECF No. 49. Relator Philip Hunter filed an Amended Complaint (ECF No. 53) on September 6, 2023, which was unsealed on September 28, 2023. ECF No. 57. In the Amended Complaint, Relator asserted five counts against Defendants for violations of the federal FCA under 31 U.S.C. §3729, and 23 counts for violations of various state FCA statutes.

Defendants moved to dismiss all claims on December 18, 2023. ECF No. 68. Relator responded on January 8, 2024 (ECF No. 70) and Defendants replied on January 22, 2024. ECF No. 71. The motion is fully briefed and ripe for review.

## III.   STANDARD OF REVIEW

### a.   Rule 12(b)(6)

In a deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] the factual allegations in the complaint as true, draw[s] all reasonable inferences in favor of the plaintiff, and assess[es] whether the complaint and the exhibits attached to it contain enough facts to state a claim to relief that is plausible on its face." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (internal quotation marks and citations omitted). Nevertheless, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and

conclusory statements." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal quotation marks and citation omitted).

### b.  Rule 9(b)

FCA claims are subject to Fed. R. Civ. P. 9(b) and must be pleaded with particularity. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004) (citing *United State ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998)). Rule 9(b) requires plaintiffs "alleging fraud or mistake. . . to state with particularity the circumstances constituting fraud or mistake." In the Third Circuit, the Rule 9(b) standard as to the FCA can be satisfied by alleging "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 155 (3d Cir. 2014). "An inference of illegality based on facts that could plausibly have either a legal or illegal explanation would be insufficient to meet Rule 9(b)'s burden, because . . . the possibility of a legitimate explanation undermines the strength of the inference of illegality." *United States v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018) (citing *Foglia*, 754 F.3d at 158). Relator does not need to show "representative samples" of the alleged fraudulent conduct, (*Foglia*, 754 F.3d at 156) but rather is only required to allege the "who, what, when, where, and how" of the scheme. *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).

### c.  The False Claims Act

"To establish a *prima facie* claim under 31 U.S.C. § 3729(a)(1), a plaintiff must show that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or

fraudulent." *Zimmer*, 386 F.3d at 242. Courts in the Third Circuit must also consider "materiality [to be] an element of all FCA claims, regardless of whether the specific statutory provision lists materiality as an element." *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 317 (3d Cir. 2019).

A claim can be factually false or legally false. A factually false claim "misrepresents what services [the claimant] provided to the government." *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 497 (E.D. Pa. 2016) (citing *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 305 (3d Cir. 2011), *overruled on other grounds*).

Legally false certifications can be either express or implied. An express false certification occurs where an entity "falsely certif[ies] that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Wilkins*, 659 F.3d at 305. An implied false certification "attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id.*

Causation under the FCA is similar to causation principles under negligence law, and a party can cause a false claim when the party's conduct was "a substantial factor in bringing about" that false claim. *Zimmer*, 386 F.3d at 244. "Moreover, a defendant may be liable under the FCA if it implements a policy that causes others to present false claims." *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 444 (E.D. Pa. 2020).

Under the FCA, knowledge is defined as "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A). "Proof of specific intent to defraud" is not required. *Id.* 3729(b)(1)(B). Moreover, under Rule 9(b), "allegations of knowledge may be alleged generally

and need not be pled with particularity." *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 503 (E.D. Pa. 2016).

To assess materiality, a court considers whether the false statement has "a natural tendency to influence, or be capable of influencing, the payment or receipt of that money or property." *United States ex rel. Int'l Bhd. of Elec Workers Loc. Union No. 98 v. Fairfield Co.*, 5 F. 4th 315, 342 (3d Cir. 2021). The court weighs "1) whether compliance with the regulation was an express payment condition; 2) whether the noncompliance was minor or insubstantial; and 3) evidence of the Government's past action or inaction." *United States v. Am. Health Found. Inc.*, 2023 WL 2743563, at *13 (E.D. Pa. Mar. 31, 2023) (citing *Fairfield*, 5 F. 4th at 342-47). To the third factor, "[t]he Government's decision not to intervene in the action weighs against materiality." *Kindred*, 469 F. Supp. 3d at 450.

## IV.   DISCUSSION

### a.   Rule 9b

Relator has failed to meet the special pleading standard required by Rule 9(b). Relator asserts two theories of liability: 1) Defendants performed grossly substandard services and then billed the government for them and 2) Defendants submitted claims to Medicare and Medicaid that were based on fraudulently inflated or non-existent medical records. ECF No. 70 at 16-21. Both of these theories stem from the same underlying allegations: namely, that Defendants understaffed their facilities to a degree that it would have been impossible to provide adequate care. Due to inadequate staffing, Relator alleges that the existing staff were unable to properly perform their duties, and thus falsified medical records in order to obtain reimbursement for services they did not perform.

Relator supports this assertion with expert analysis, which allegedly quantifies the acuity of the patients in Defendants' facilities, the number of hours it would take to care for those residents, and the number of hours available per Defendants' staffing requirements, and finds that it was mathematically impossible for Defendants to provide appropriate care. ECF No. 53 ¶¶ 179-84. Relator also cites a series of complaints received via an unidentified "survey process" (*id.* ¶ 177 n.61), and affidavits from two healthcare professionals in separate lawsuits, attesting to understaffing at two Golden Living locations in Kentucky and Wisconsin. *Id.* ¶¶ 186-87. Relator's resignation letter similarly cites complaints about understaffing, such that he had to "stay late on many occasions" to perform "wound treatment duties" in addition to his "supervisory duties." *Id.* ¶ 37.

Per *Foglia*'s two-part test, Relator must 1) "provide particular details of a scheme to submit false claims" along with 2) "reliable indicia that lead to a strong inference that claims were actually submitted." 754 F.3d at 158. Relator has satisfied the first element of the *Foglia* test by making allegations of a scheme; however, he has failed to satisfy the second element since he has not alleged "reliable indicia" of fraud that lead to a "strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 156. Indeed, Relator's own personal experience working at a Golden Living facility illustrates his failure to allege reliable indicia of fraud. Although Defendants may have been recruiting high-acuity patients and not hiring sufficient staff, Relator alleges that he performed more work than he was supposed to and stayed late on multiple occasions. ECF No. 53 ¶ 37. Relator does not allege that he personally falsified data in order to make false claims, just that he worked more than he should have in order to make up for the lack of staffing. *Id.* Nowhere does he allege that he submitted, or was instructed to submit, any false claims for work he did not perform. *Id.* Nor does he allege that the work he performed was substandard to the point of

worthlessness. *Id.* Relator's personal complaints amount to generalized concerns about improper documentation made to unidentified administrators ("the Director of Nursing, Administrator, and other department heads") at unspecified times (*Id.* ¶ 32), and similarly vague complaints that "the care services provided to residents…were not consistent with accepted standards of medical practice." *Id.* ¶ 36.

The two affidavits from the healthcare professionals that Relator cites are similarly insufficient to provide reliable indicia of fraud. One affidavit complains about understaffing at a single Golden Living location and states that "[m]any care duties were simply not done or not done in a timely fashion." ECF No. 53 ¶ 186. This allegation in itself is insufficient to establish a worthless services claim, since it is not specific enough as to the level of care that was provided. *See In re Genesis Health Ventures, Inc.*, 112 F. App'x 140, 143 (3d Cir. 2004). Moreover, despite the affiant's difficulty in performing her work, she, like Relator, does not state that she submitted false claims, or that she was instructed to submit false claims. *See* ECF No. 53 ¶ 186

The second affidavit makes similar complaints about understaffing, claiming that due to the staffing structure "there was no way to provide adequate care to any of the residents." *Id.* ¶ 187. Again, a lack of adequate care does not equate to a worthless services claim. *Genesis*, 112 F. App'x at 143. The affidavit goes on to state that health aides "document[ed] the resident's needs level[, but that] did not mean care was provided…The [entries] were done because we were told the information was necessary to justify the facility's Medicare billing and reimbursement. However, this documentation was routinely filled in with nothing but guesswork or false entries to comply with the paperwork demands by management." *Id.* This affidavit does not identify any examples of false claims, nor does it clarify which forms were falsified, and whether those were the same forms Relator refers to in his Complaint. Further, the affidavit does not state that

employees were told to falsify paperwork as part of a scheme, only that they did so because they found the demands of their job to be difficult. Overwork alone does not equate to false claims being submitted, and the allegation of submission of vague and unidentified false claims does not equate to implementing a scheme to submit false claims. Relator is not required to "identify a specific claim for payment" that was falsified at this stage of the case. *See Foglia*, 754 F.3d at 156. Nevertheless, Relator's sole evidence of falsified claims amounts to an excerpt of an affidavit covering an unidentified span of time that makes general allegations of falsification at a single facility. This, by itself, is not *reliable* indicia of fraud sufficient to overcome the Rule 9(b) standard.

Relator frames his experts' conclusions as the centerpiece of his allegations, asserting that due to the staffing structures in place, "GOLDEN LIVING's claims and certifications of ***ADL care were mathematically and humanly impossible.***" ECF No. 53 ¶ 179 (emphasis in original). However, accepting the experts' conclusions at face value still provides no more than a "mere opportunity for fraud." *United States ex rel. Gohil v. Sanofi-Aventis U.S. Inc.*, 96 F. Supp. 3d 504, 517 (E.D. Pa. 2015) (citing *Foglia*, 754 F.3d at 157). The expert evidence, as pleaded in the Amended Complaint, only alleges that there were not sufficient employees to perform all the necessary work, creating an opportunity for false claims to be submitted. Relator purports that his experts have "quantified" the number of hours required to service the patient population, the number of hours actually worked, and the number of hours possible to work. ECF No. 53 ¶ 179. However, Relator does not state that he provided his experts with *the claims actually billed* at all 273 facilities in question.[4] The very real "possibility of [the] legitimate explanation" that Defendants pushed their employees hard and only billed for work performed "undermines the strength of the inference of illegality." *Omnicare*, 903 F.3d at 92.

---

[4] Nor does Relator imply how he would have obtained the relevant data for any period after February 2007, when he submitted his resignation, or that his experts in fact had that data.

Relator's failure to plead reliable indicia of fraud is highlighted by comparing his allegations to other successful FCA claims. Successful relators have, for example, personally reviewed "numerous examples" of false claims, and explained in detail how they knew the claims were false. *See Polansky v. Executive Health Resources, Inc.*, 2018 WL 1403433, at *1 (E.D. Pa. Mar. 19, 2018). Alternatively, a successful relator could provide evidence of fraud by citing specific examples of 1) supervisors who encouraged them to participate in the scheme, 2) colleagues who participated in the scheme, 3) patients who were victims of the scheme, and 4) false claims that were submitted based on experiences with these identified patients. *See United States ex rel. Class v. Bayada Home Health Care, Inc.*, 2018 WL 4566157, at *13-*14 (E.D. Pa. Sept. 24, 2018).

By contrast, Relator offers only an overview of the scheme, with no accompanying factual explanation of how and whether any false claims were actually submitted. "Although Relator [is] not obligated to identify a particular false claim, he [is] obligated to use an alternative means of injecting precision and some measure of substantiation into [his] allegations of fraud, thus placing [Defendants] on notice of the precise misconduct with which it is charged and safeguarding against spurious charges of immoral and fraudulent behaviors." *United States ex rel. Underwood v. Genentech, Inc.*, 720 F. Supp. 2d 671, 679 (E.D. Pa. 2010) (citing *Rolo v. City Investing Co. Liquidating Tr.*, 155 F. 3d 644, 658 (3d Cir. 1998), *abrogated on other grounds*).

The lack of specificity in Relator's Amended Complaint illustrates the reason for the Rule 9(b) standard. Relator has alleged that Defendants "routinely presented or caused to be presented false or fraudulent UB-04 claims" in 273 facilities over the course of 13 years. ECF No. 53 ¶ 152. However, because Relator does not assert that *all* claims were false and concedes that some care was provided (*see e.g.*, ¶¶ 36-37), Relator has provided no parameters for Defendants to ascertain

which claims to investigate, and thus has not given "adequate notice so that [Defendants] can intelligently respond." *United States ex rel. Zwirn v. ADT Sec. Servs., Inc.*, 2014 WL 2932846, at *11 (D.N.J. June 30, 2014) (citing *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Ops., Inc.*, 653 F.3d 225, 233 (3d Cir. 2011)). Relator is not required to put forth "representative samples" of false claims as other successful relators have, but he has not injected any factual detail that would substantiate his allegations with reliable indicia of fraud. *Foglia*, 754 F.3d at 156.

### b. FCA Falsity

As evidenced by Relator's failure to allege the fraud with the particularity required by Rule 9(b), his Amended Complaint fails to allege factual or legal falsity as required by the FCA on either of his theories.

### i. Factual Falsity – Inflated Claims

Relator's allegations of factual falsity as to his inflated claims allegation are conclusory and are therefore disregarded. As discussed, Relator makes substantial allegations of understaffing; his expert work, resignation letter, and cited affidavits indicate that Defendants' facilities were understaffed. Yet whenever Relator seeks to take the next step and allege that Defendants submitted false claims as a result of not having enough staff to serve their patients, he reverts to the same conclusory formulas that simply restate the element of falsity. *See e.g.*, ECF No. 53 ¶ 149 ("GOLDEN LIVING knew that the government would not detect its scheme to increase its Medicare revenues by submitting false claims for payment that were not supported by medical records"); ¶ 155 ("GOLDEN LIVING knowingly and routinely made, used, or caused to [be] made and used, false MDS records and statements material to false or fraudulent claims for payment to Medicare in violation of 31 U.S.C. § 3729(a)(1)(A) and (B)."); ¶ 166 ("GOLDEN LIVING

engaged in a scheme to obtain payment from Medicaid and Medicare by knowingly submitting false claims for payment for services that were excluded/non-covered under the Medicare/Medicaid insurance programs."). *See also id.* ¶¶ 18, 154, 156-58, 191-93.

Relator's Amended Complaint does not put forth any facts alleging that claims were falsified. Rather, his Amended Complaint generally and repeatedly alleges that due to understaffing, claims were "routinely falsified," but without providing any factual details that would support the submission of false claims. *Id.* ¶ 32. Simply identifying the names of the forms that Relator alleges were falsified (*see* ECF No. 70 at 10) is insufficient without more factual detail. *See e.g.*, *United States ex rel. Knisely v. Cintas Corp., Inc.*, 298 F.R.D. 229, 240 (E.D. Pa. 2014) (dismissing FCA due to insufficient specificity as to perpetrators and details of submission of false claims). Relator has not named any individuals that submitted false claims, or that directed employees to submit false claims; he has not identified any specific facilities at which false claims were submitted; he has not provided any examples of care that was not performed but documented; nor has he provided the names of any residents who were harmed by receiving worthless, or even substandard, care. *See e.g.*, *Taylor v. Comhar, Inc.*, 2021 WL 3857799, at *4 (E.D. Pa. Aug. 30, 2021) (dismissing case when "complaint [did] not include information as to…the identities of the perpetrators and residents . . . and whether Defendant sought Medicare and Medicaid reimbursement for services provided to the harmed residents.").

In the absence of factual details to support his claims, Relator's allegations are essentially pleadings on information and belief, which "do not satisfy Rule 9(b) unless the complaint sets forth the facts upon which the belief is founded." *Zwirn*, 2014 WL 2932846, at *8 (citing *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313 (D.N.J. 2005)). Relator's lack of facts supporting his assertion dooms his claims. *See United States ex rel. Thomas v. Lockheed Martin*

*Aeroparts, Inc.*, 2016 WL 47882, at *9 (W.D. Pa. Jan. 4, 2016) (dismissing complaint where "many of Plaintiff['s] allegations [were] based upon his beliefs or submissions."). Relator's allegations are particularly wanting given that they cover a period of nearly two decades, without a single named individual or entity of any kind. *See Zwirn*, 2014 WL 2932846, at *8 (dismissing complaint where allegations "lack precision…span[ning] decades, jurisdictions, administrations, and corporate identities.").

Relator's cited cases illustrate the deficiency of his own pleading. Relator's inflated claims citations provide substantially more detail as to the specifics of the inflated claims than Relator's Amended Complaint, with relators in those cases providing examples and detailed personal knowledge of submission of inflated claims. Relator notes that the relator in *Ellsworth* successfully alleged falsity on the basis of "submission of PDE data to CMS with false DAW codes," attempting to argue that simply asserting the forms that were allegedly falsified is sufficient to survive a motion to dismiss. *United States ex rel. Ellsworth Assoc. LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381, 396 (E.D. Pa. 2023). However, the complaint in *Ellsworth* contained more fulsome allegations than Relator's Amended Complaint, as it included "many…specific examples" as well as a named former executive of the defendant who reported the scheme but was rebuffed by senior management – a clear indicator of fraud. *Id.* at 400. Similarly, the relator in *Carson* was personally aware of the scheme and provided examples of the patients he treated whose records were altered by individual supervisors without regard for the actual care provided. *Carson v. Select Rehabilitation, Inc.*, 2023 WL 5339605, at *5 (E.D. Pa. Aug. 18, 2023). There, the relator refused to participate in the scheme, complained to management about the improper conduct, and was terminated. *Id*. By contrast, Relator's resignation letter does not include any allegations of

overbilling (ECF No. 53 ¶ 37), and his "frequent complaints" to supervisors related to "unsafe staffing levels" and standards of care rather than false claims. *Id.* ¶ 36.

### ii. Factual Falsity – Worthless Services

A worthless services theory "addresses instances in which either services literally are not provided or the service is so substandard as to be tantamount to no service at all." *Genesis*, 112 F. App'x at 143. An FCA plaintiff "cannot merely describe a private scheme in detail but then…allege simply and without any stated reason for his belief that claims requesting illegal payments must have [been] submitted, were likely submitted, or should have been submitted to the Government." *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). The FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs. Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). To state a worthless services claim, "the performance of the service [must be] so deficient that for all practical purposes it is the equivalent of no performance at all . . . .  [A] diminished value of services theory does not satisfy this standard. Services that are 'worth less' are not worthless." *Taylor*, 2021 WL 3857799, at *3 (quoting *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014)). A relator fails to assert a worthless services claim where "he has not stated that the care at defendants' facilities was so substandard as to be tantamount to no services." *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 448 n.12 (E.D. Pa. 2020).

Nowhere does Relator identify "the frequency of the alleged [lack of treatment], the identities of the perpetrators and residents, the overall level of care provided to the residents, and whether Defendant sought Medicare and Medicaid reimbursement for services provided to the

harmed residents."[5] *Taylor*, 2021 WL 3857799, at *4.  Relator's sole allegations as to substandard care are a non-specific set of allegations derived from an unidentified "survey process." ECF No. 53 ¶ 177 n.61. Relator does not specify at which of the 273 locations any of these incidents occurred, to whom they occurred, when they occurred, or how often they occurred. Relator's vague allegations of mistreatment of patients are not specific enough to allege falsity under Rule 9(b).

Again, each of the cases Relator cited to support his worthless services claim contained far more detailed allegations of worthless services, identifying specific harms to specific residents. Relator claims that his facts are "substantially similar" to those in *United States v. Am. Health Found., Inc.*, 2023 WL 2743563 (E.D. Pa. Mar. 31, 2023). ECF No. 70 at 19. In fact, examination of that case merely reveals the deficiency in Relator's pleading. In *American Health*, the government "identifie[d] five specific Medicare and Medicaid beneficiaries who suffered from numerous falls during the relevant time period," as well as a failure to heed warnings related to those falls and a failure to intervene following the falls. *Id.* at *2. The government also identified a resident whose "pressure ulcer was left untreated and grew over three months"; a resident who was placed in isolation and not fed; a resident who had a history of suicidal ideation and was left untreated, and many more specific examples of harm to specific residents. *Id.* at *2-*4.[6] Relator adduces no similar examples in his Complaint, nor does he provide any other factual supplementation as to the level of services provided.

---

[5] Indeed, Relator appeared to withdraw his worthless services claim at the hearing on the Motion to Dismiss. *See* ECF No. 74 at 9-10 ("[Y]ou can't proceed on [a worthless services] claim, if some services have been provided and we do not allege that no services were provided. So, you know, I think [Defendant's counsel] is correct on that."). Nevertheless, the Court will address the issue for the sake of completeness.

[6] Although the Court will not exhaust the issue, the other cases cited by Relator likewise contain highly specific allegations of worthless services that serve as a marked contrast to Relator's generalized allegations. *See e.g.*, *United States ex rel. Acad. Health Ctr., Inc. v. Hyperion Found., Inc.*, 2014 WL 3385189, at *15-*20 (S.D. Miss. July 9, 2014) (providing specific, detailed examples of seven residents who suffered from a lack of care and were grievously injured).

### iii.  Legal Falsity

Relator does not successfully state a legally false claim under express or implied false certification either. To make either claim, there must be particular statutes or regulations that are either expressly or implicitly violated by the filing of the false claims. *Wilkins*, 659 F.3d at 305. Implied false certification requires "specific representations about the goods or services provided and the claimant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements." *Schmelpfenig v. Dr. Reddy's Labs. Limited*, 2017 WL 1133956, at *6 (E.D. Pa. Mar. 27, 2017).

Relator alleges that legally false statements were made when Defendants filed UB-04 forms certifying that the billing information provided in the claim forms was accurate, when it was not. ECF No. 70 at 17 (citing ECF No. 53 ¶¶ 155, 157-58). The UB-04 includes a certification stating that the form is "true, accurate and complete." ECF No. 53 ¶ 106. Relator would be able to state a claim if he had successfully pleaded that the UB-04s were in fact inaccurate. *See United States ex rel. Jackson v. DePaul Health Sys.,* 454 F. Supp. 3d 481, 498-99 (E.D. Pa. 2020). However, because the Relator failed to plead factual falsity, he cannot make out a legal falsity claim where liability is based solely on the accuracy of the submission.

Further, Relator does not point to any other statutes or regulations that Defendants are alleged to have violated other than those related to the accuracy of submissions.[7] Relator's Amended Complaint and Opposition briefly suggest basing a legal falsity claim on failure to comply with federal staffing requirements. *See* ECF No. 53 ¶ 185 nn.66, 69; ECF No. 70 at 25. An express certification theory fails because Relator does not specifically allege that Defendants

---

[7] The Amended Complaint does state that "GOLDEN LIVING repeatedly and expressly certified to the government that, at all times material, it had complied with the laws applicable to the operations of its nursing homes" citing 42 C.F.R. 483, Subpart B. *See* ECF No. 53 at 77 n.69. This subpart has 24 subsections and Relator has not identified which subparts Defendants are alleged to have violated, or pointed to any facts underlying those claims.

18

specifically certified compliance with federal staffing requirements, instead improperly lumping that allegation in with a general certification attesting to compliance with all rules and regulations. *See* ECF No. 53 ¶¶ 185 n.66, 198. Relator does not identify where any of the relevant forms contain certifications requiring compliance with staffing requirements. *See United States ex rel. Freedman v. Bayada Home Health Care, Inc.*, 2021 WL 1904735, at *9 (D.N.J. May 12, 2021) ("[Relator] does not point to any provision in either form where [Defendant] explicitly represented compliance" with the specific regulations at issue).

Stating a claim under the implied certification theory requires that the claims in question "make[] specific representations [about the goods or services provided] that, in conjunction with the claimant's purposeful omissions, renders the ensuing claims legally false. *United States ex rel. Whatley v. Eastwick College*, 657 F. App'x 89, 94 (3d Cir. 2016) (citing *Escobar*, 579 U.S. at 190). Relator does not allege that Defendants made specific representations about staffing in their claims for payment, only that they violated the existing regulations by failing to comply with the staffing regulations. Therefore, Relator has not adequately alleged an implied false certification theory.

Even if false certifications were made, Relator has not sufficiently alleged that those certifications were material. Relator only generally alleges that adherence to staffing requirements was a condition of payment, citing boilerplate language that "skilled nursing facilities and nursing facilities must be in compliance with federal and state requirements (including 42 C.F.R. Part 483, Subpart B)" (for Medicaid) and "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider." ECF No. 53 ¶ 198 n.69. Multiple federal courts have failed to find materiality solely based on "boilerplate language conditioning payment under Medicare and Medicaid on compliance with all laws and regulations.". *Kindred,* 469 F. Supp. 3d at 450 (citing *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 241 (5th Cir.

2020). Here too, Relator's only allegations as to materiality are the same boilerplate language.

**State Law Claims**

Relator has not made any separate allegations pertaining to the state law claims, and thus "each such state law claim rests on the exact same factual allegations and exact same [] theory as Relator's federal FCA claims." *United States v. Bracco USA, Inc.*, 2022 WL 17959578, at *7 (D.N.J. Dec. 27, 2022). *See also United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 543 n.159 (E.D. Pa. 2022) ("Where no party has alleged a material difference between the standards applicable to the FCA and equivalent state laws, on a motion to dismiss these claims succeed or fail together."). Since Relator's federal FCA claims are dismissed, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims. *United States ex rel. Whatley v. Eastwick Coll.*, 2014 WL 4487747, at *8 (D.N.J. July 23, 2015) (citing 28 U.S.C. § 1367(c) (internal citation omitted)).

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 68) is **GRANTED** in its entirety, and the case is dismissed. An appropriate Order will follow.

BY THE COURT:

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**